```
 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,          )  Docket No. 02 CR 635
 4                                       )
                          Plaintiff,    )
 5                                       )
                 vs.                    )
 6                                       )
     KEVIN TURNER and PRINCE TURNER,    )
 7   JR.,                                )  Chicago, Illinois
                                         )  March 4, 2004
 8                        Defendants.   )  9:45 o'clock a.m.

 9
              TRANSCRIPT OF PROCEEDINGS - SENTENCINGS
10             BEFORE THE HONORABLE CHARLES P. KOCORAS

11
     APPEARANCES:
12
     For the Plaintiff:       HON. PATRICK FITZGERALD
13                            United States Attorney
                              BY:  MR. STUART FULLERTON
14                            219 S. Dearborn St., Suite 500
                              Chicago, Illinois  60604
15

16   For the Deft. Prince     MS. GWENDOLYN ANDERSON
     Turner, Jr.:            6727 S. Euclid Avenue
17                            Chicago, Illinois  60649

18   Also Present:           MR. ZACHARY FREEZE, Probation Officer

19   Court Reporter:         MS. JOENE HANHARDT
                              Official Court Reporter
20                            219 S. Dearborn Street, Suite 2524-A
                              Chicago, Illinois  60604
21                            (312) 435-6874

22            * * * * * * * * * * * * * * * * * *
                     PROCEEDINGS RECORDED BY
23                 MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED BY COMPUTER
24

25
```

```
 1              THE CLERK:  02 CR 635, U.S. vs. Prince Turner, Jr.
 2              MS. ANDERSON:  Good morning, your Honor.
 3              THE COURT:  Good morning, Ms. Anderson.
 4              MS. ANDERSON:  For the record, my name is Gwen
 5    Anderson.
 6              Present in court is my client, Prince Turner.
 7              The matter today is here for sentencing.
 8              MR. FULLERTON:  Stuart Fullerton for the United
 9    States.
10              Good morning, your Honor.
11              THE COURT:  Good morning.
12              MS. ANDERSON:  Your Honor --
13              THE COURT:  I have Mr. Freeze here from the Probation
14    Office.
15              MS. ANDERSON:  I forgot about that.
16              MR. FREEZE:  Judge, Zachary Freeze with the U.S.
17    Probation office.
18              THE COURT:  Okay.
19              Now, we have -- let me tell you what documents I have.
20              I have the Presentence Report Mr. Freeze prepared;
21    and, then, Ms. Anderson has filed on behalf of Mr. Turner a
22    motion to correct specific portions of the presentence report.
23              Have you gotten a copy of that, Mr. Fullerton?
24              MR. FULLERTON:  Yes.
25              THE COURT:  I am going address that in a minute.
```

1          Before I do that, have you all had a chance to read

2     the Presentence Report in this case?

3          MS. ANDERSON:  Yes, your Honor.

4          My client and I went through it extensively, your

5     Honor, the first of this month, Monday.

6          THE COURT:  Mr. Fullerton, have you had a chance to

7     read it?

8          MR. FULLERTON:  I have, yes.

9          THE COURT:  Mr. Turner, have you had a chance to go

10    over it with Ms. Anderson, as she has said?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And you have had chance to read it, as

13    well?

14         THE DEFENDANT:  Yes.

15         THE COURT:  All right.

16         She has raised some matters that I am going to address

17    momentarily; but, the question I have to all three of you is

18    whether there is anything in the report, other than what has

19    been questioned, of a factual nature, that any of the three of

20    you thinks is incorrect?

21         MR. FULLERTON:  Not on my behalf, your Honor.

22         MS. ANDERSON:  Just those things that I raised.

23         THE COURT:  All right.

24         MS. ANDERSON:  And, Judge, I will be striking one of

25    them.

4

1          THE COURT:  Which one?

2          MS. ANDERSON:  The one relative to the Level 4.

3          THE COURT:  Okay.

4          There was some explanations for that.  There were

5     three additional points.

6          MS. ANDERSON:  I saw that.

7          THE COURT:  One for one thing and two points for

8     another thing, which took it up to a calculus of 9, which put

9     it in a Criminal History Category of 4.  And that is on Page

10    12, I thought.

11         MS. ANDERSON:  Yes.

12         Judge, you know, it was kind of hard because the

13    calculations are difficult.

14         THE COURT:  I know, it was buried in there.

15         MS. ANDERSON:  But I did go through it, again, and I

16    underlined it and there are nine Criminal History points.

17         THE COURT:  Okay.

18         MS. ANDERSON:  My client is looking at me like, "So,

19    what is going on?"  But I spent a lot of time with him, Judge.

20         THE COURT:  Mr. Turner, you have a plea agreement with

21    the government and you probably know the major part of it, but

22    it depends on, in part, on what the Guideline calculation is.

23         The Guideline calculation has two parts to it.  One is

24    what is this level that you are at, based on the nature of the

25    crime and some other things.  Okay?

1          And, then, the second computation has to do with what

2    Criminal History category are you in.

3          And in your preliminary discussions with the

4    government, you thought you were in a Category 3; and, it turns

5    out, because these violations took place both while you were on

6    either probation or supervised release and within two years of

7    your release, there are some additional points that are added.

8          So, those are a total of three points to the

9    six points.  So, you get a total of nine points, which you need

10   to be a mathematician to follow all of this, but the nine

11   points converts to a Criminal History Category of 4, which is

12   one level higher than what you all had originally done.

13         Now, that is probably not the clearest explanation you

14   have ever had, but do you get a general idea of that?

15         (No response.)

16         THE COURT:  Tell me where you are confused.

17         THE DEFENDANT:  I am confused on how I get from 6 to

18   9.

19         THE COURT:  Okay.

20         You have the report there.  Look on Page 12 of the

21   report.

22         MS. ANDERSON:  Judge, I have it.  And let me just add

23   for the record that we spent a lot of time with this.

24         THE COURT:  I know, but he is still confused.  So, I

25   want him to understand this.

```
 1              MS. ANDERSON:  Well, I have 12 now, Judge.

 2              THE COURT:  All right.

 3              Look in the -- Mr. Turner, look under the Criminal

 4    History computation.  Okay?

 5              So, do you see at Line 318 there, I am going to read

 6    what that says.

 7              "The instant offense was committed less than two years

 8    following the defendant's release from custody in 1997 for the

 9    sentence imposed on April 15th, 1997, for the offense of

10    calculated criminal conspiracy in the case of People of the

11    State of Illinois vs. Prince Turner, Jr."

12              You had a state conviction for this --

13              (Whereupon, the defendant and his attorney conferred.)

14              THE COURT:  You have to listen to me, Mr. Turner.

15              MS. ANDERSON:  Sorry, Judge.

16              THE COURT:  I do not want to just be talking to myself

17    here.

18              You were convicted and there was a sentence imposed on

19    April 15th of 1997 in the state system.

20              You understand that, right?

21              THE DEFENDANT:  Yes.

22              THE COURT:  Do you want me to tell you what page that

23    is reflected on?

24              THE DEFENDANT:  Yes, please.

25              THE COURT:  All right.
```

1              (Brief pause.)

2              MS. ANDERSON:  Judge, I believe it is the Kane County

3    case we are talking about.

4              THE COURT:  Which one, Kane County?

5              MS. ANDERSON:  Kane County.

6              And I have been through this, but we'll go through it,

7    again.

8              It was the case that he was arrested -- I think if we

9    are looking at the case on Page 9, where he was arrested --

10   11-22-89.  He pled guilty in '97, I believe.

11             THE COURT:  I do not know.  That is not it.

12             THE DEFENDANT:  That is not it.

13             MS. ANDERSON:  Not it?  Okay.

14             THE COURT:  Do you want to know something?  That one

15   is not listed.

16             Oh, I take it back.

17             MS. ANDERSON:  One minute, Judge.

18             THE COURT:  That has to be the 1993 case.

19             MS. ANDERSON:  It is the '93 case, Judge.

20             What happened --

21             THE COURT:  My mistake.

22             Look at the top of Page 10, Mr. Turner.

23             Now, these are just entries on your rap sheet, but

24   here is what I think they compute to.

25             Apparently you were arrested on February 18th of 1993,

1   when you were 28 years old, in Kane County; and, Count 4, which

2   is the count you were found guilty of -- there might have been

3   other counts; I do not know what happened to them; it does not

4   really matter -- but as to Count 4, which is called,

5   "Calculated Criminal Drug Conspiracy," do you see that?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Kane County Circuit Court Docket 93 CF

8   256.

9           This is a 1993 case; but, for some reason, it does not

10  get resolved until April 15th of 1997.

11          MS. ANDERSON:  There was an appeal to the appellate

12  court, Judge.

13          THE COURT:  Fine.

14          On April 15th of 1997 -- and the date is important --

15  you were found guilty and you got a sentence of 180 days in

16  jail -- or six months in jail; 30 months' probation; and, a

17  fine of and costs of $3,760.

18          Do you see that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Okay.

21          Now, the crime you pled guilty to in front of me took

22  place within two years of that April 15, 1997 date.

23          Do you see that?

24          Your involvement in this case took place in 1997-98,

25  or thereabouts, right -- your activity here in this case?

1              THE DEFENDANT:  This one?

2              THE COURT:  This one.

3              THE DEFENDANT:  Yes.

4              THE COURT:  This conspiracy that you pled guilty to.

5              THE DEFENDANT:  Yes.

6              THE COURT:  With your brother and some other people.

7              THE DEFENDANT:  Yes.

8              THE COURT:  Okay.

9        Your conduct and your crime in this case took place

10   within two years of April 15th, 1997.  And, so, under the law

11   -- that no one can change -- if you do something within

12   two years of a prior conviction, you get some extra points.

13             And the theory behind that is that when you become a

14   recidivist -- or a person who is continually violating the

15   law -- you have to get extra punishment because the law

16   punishes multiple offenders more harshly than if you were here

17   for the first time in a court of law on a criminal violation.

18             Do you understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  That is where two points -- I think

21   two points -- come for that; is that correct?

22             MS. ANDERSON:  That is, Judge.

23             THE COURT:  And the other thing is that when you

24   committed the crime that you pled guilty to in front of me, you

25   were on either supervised release or probation for some other

1    offense.  And the law punishes that, too, and adds some more

2    points for that.

3           So, between the crime before me being committed within

4    two years of your last conviction, and committed while you are

5    on probation or release in another case, then you get another

6    point for that.

7           You wind up with three more points that you did not

8    realize were going to be added.  And they are only added

9    because the law requires them to be added.

10          Do you see that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  So, that is how we went from 6 to 9

13   points.  And that is what you have a total of is 9 points --

14   this Criminal history thing -- and the 9 points converts to a

15   category of 4.

16          Did I do that right, Mr. Freeze?

17          MR. FREEZE:  Judge, you did.

18          MS. ANDERSON:  And, Judge, I also ordered -- I sent my

19   client -- that was always a dispute about the Kane County case.

20   I sent him a printout of the case that I got myself before

21   Christmas, because that was one of the problems we had with the

22   plea negotiations, because I went through the same discussions

23   you have just gone through on Monday, pointing it out to him,

24   you know, why he got --

25          THE DEFENDANT:  No, you didn't.  You told me that I

1   had 6 points.  That is what you indicated to me.  And the

2   Judge --

3            THE COURT:  Well, that is what you started out with --

4   6; but, because of these add-ons, if you will, you wind up with

5   9.  And it bumps you one level.  That is what happened.

6            Do you follow that?

7            THE DEFENDANT:  Somewhat, yes, you know.

8            THE COURT:  Well, tell me where you are stuck.

9            THE DEFENDANT:  I am just --

10           THE COURT:  I know you are unhappy about it, but --

11           THE DEFENDANT:  The 6 points, it was, you know, kind

12  of hard to accept already; but, then, to jump from 6 to 9; and,

13  then, when I just stepped in here, my lawyer's telling me it is

14  9.  And I was thinking it was just 6.  And, you know --

15           MS. ANDERSON:  Judge, had I had an opportunity to go

16  back to see him yesterday, I would have gone back and explained

17  to him that I had determined that it was 9.

18           What happened is I went to see him last Wednesday and

19  waited four hours and never did get in.  And that is why I went

20  on Monday.  I don't normally do things this late.  But I went

21  through this (indicating).  You can see I marked all over this

22  (indicating) and explained it to him.

23           THE COURT:  I am not --

24           MS. ANDERSON:  And we were concerned about the

25  three points.

```
 1            THE COURT:  Look, I am not -- there is nobody to
 2   blame.  Sometimes it is hard to get in and it is hard to
 3   understand these things.
 4            MS. ANDERSON:  That --
 5            THE COURT:  These Guideline calculations, Mr. Turner,
 6   are kind of tricky, even for lawyers and judges.  So, I am not
 7   saying anybody, you know, made some colossal mistake here.
 8   They did not do that.  It is just that you never know what the
 9   final result is until you take all of the facts, put them
10   together and do it step by step by step by step, which is
11   exactly what the function of the Presentence Report is.  And
12   that is what Mr. Freeze did.
13            You all did the best judgment you could, under the
14   circumstance, and you came close -- both you and the government
15   -- but you were not exactly 100 accurate.
16            But that is how we got to where we got, and that is
17   where we are today.
18            THE DEFENDANT:  And, so, does that reflect this
19   agreement that me and the government are supposed to have?
20            THE COURT:  The agreement that you have with the
21   government does not change.  I mean, you had -- your final
22   agreement with the government is, essentially, this.  I think
23   the percentage is this:  You and the government agree that you
24   would get 75 percent of either the minimum mandatory sentence
25   or the low end of the Guideline range, whichever of those two
```

1    was higher.

2              Is that not right?

3              MR. FULLERTON:  Yes.

4              MS. ANDERSON:  That is correct, Judge.

5              THE COURT:  So, that is your deal with the government.

6    All right?

7              And instead of facing -- which I think you faced both

8    because of the nature of the conspiracy here, the quantity of

9    drugs and your prior record -- you were facing life in prison.

10             It is harsh to say, but that was what you were looking

11   at if you were convicted after a trial.  Okay?

12             Now, you and your lawyer and the government had plea

13   discussions.  You came up with, if you cooperated and testified

14   truthfully, they would recommend to me and move me to give you

15   a lesser sentence that would otherwise be available to me to

16   punish you for.  And, so, that was the 75 percent of whichever

17   of two numbers was the highest.

18             And in order to come to what that actually means, in

19   terms of time, we have to calculate the Guideline calculation.

20   And one component of that, as I said, is your prior record and

21   Criminal History Category.  Another is the Adjusted Offense

22   Level that you find yourself at.

23             So, we have to do all of that math.  This is where

24   these three extra points come in.

25             And, then, you compare that to the minimum mandatory

1    in this case, which is, I think, 10 years.

2              Is it not?

3              MR. FULLERTON:  Yes.

4              MS. ANDERSON:  Yes, Judge.

5              THE COURT:  So, 10 years computes to 120 months.  And

6    your Guideline range is much higher than that.  So, you know 75

7    percent has to come off the range that is calculated here, as

8    opposed to the minimum mandatory sentence of 10 years.

9              And that is how we got to where with got.

10             So, the only thing I can tell you, in all candor and

11   honesty, is that the numbers were pretty close when your lawyer

12   and the government and you discussed the idea of this plea

13   agreement, in terms of what your Guideline calculation would

14   be.

15             The Guideline calculation actually, in terms of

16   Adjusted Offense Level, was exactly -- computed exactly --

17   correctly.

18             The Criminal History Category was somewhat off by one

19   level, and it is for the three points we just spent a few

20   minutes talking about.

21             So, that is where we are.  All right?

22             Unless you have further questions that I would try to

23   answer, I am going to take up the rest of Ms. Anderson's

24   challenges to the Guidelines -- to the Presentence Report --

25   which are not material; but, in terms of accuracy, we need to

1    do that.

2              On Page 2, 5-A, it is argued that Mr. Turner did not

3    deliver money to Steve Brown on behalf of Kevin Turner.

4              That is your position; is it not?

5              MS. ANDERSON:  Yes, Judge.

6              I mean, I don't know how material it is.

7              THE COURT:  It is not material --

8              MS. ANDERSON:  It should be corrected.

9              THE COURT:  -- but I want to just -- do you agree with

10   that?

11             MR. FULLERTON:  I agree that Ms. Anderson is correct

12   about what happened.  I am not sure that the PSR actually says

13   what she says it says.  But if it does, it ought to be

14   corrected, in my view.

15             MS. ANDERSON:  Well, Judge, I looked at the plea

16   agreement of Kevin Turner, Steve Brown and, also, the

17   government's -- and, also, the defendant Turner here, and I did

18   not see any transactions between -- involving any dealings

19   directly between -- Steve Brown and Prince Turner.

20             Actually, Steve -- Prince Turner's involvement dealt

21   mainly with McLee and Kevin Turner directly.  And that is why

22   we moved to correct that section.

23             THE COURT:  All right.

24             If you look on Page 5, at Line 149, it reads, "On

25   occasion, Brown also delivered money to defendant on behalf of

1  Kevin Turner."

2       And I think Mr. Turner and Ms. Anderson are saying

3  that did not happen.

4       Is that not right?

5       MS. ANDERSON:  We have no evidence that it happened,

6  and my client denies that that happened.  And it was not in his

7  plea agreement, nor is it in Steve Brown's plea agreement.

8       THE COURT:  That is what she is saying.

9       And Mr. Fullerton, if I read that right, then that is

10  the factual challenge.

11       MR. FULLERTON:  I misread her objection then, Judge.

12  Her objection was to anything that said that Prince delivered

13  money to Steve Brown.

14       THE COURT:  Well, that is what it says.  So, we have

15  it the other way.

16       MR. FULLERTON:  I now understand the import of what

17  she is saying.

18       I don't have any an objection to changing that, your

19  Honor.

20       THE COURT:  All right.

21       Zachary, we will strike that line.

22       MR. FREEZE:  Judge, which line specifically?

23       THE COURT:  All right.  The line, "On occasions, Brown

24  also delivered money to defendant on behalf of the Kevin

25  Turner."  Just strike that line.

1          MS. ANDERSON:  149 to 150, Judge.

2          THE COURT:  Right.

3          Just strike that sentence altogether.  You do not have

4    to make any allusion to Brother Brown.  Okay?

5          All right.  Now, the next one, (b) -- 5(b) -- I am not

6    quite sure what are you seeking here, at least that is what my

7    notes say.

8          MS. ANDERSON:  Judge, I know -- and I talked to my

9    client and I think he was concerned that he had no history of

10   guns.  And, then, when I went back, after I -- I did this,

11   Judge, like trying to buy time because I did it on Tuesday --

12   Monday and Tuesday.  I am not sure what I meant.  I think my

13   client is telling me he had no prior history of guns.

14         We looked at Page 16 of the PSR, which indicated a

15   list of cases he had been charged with, but had never been

16   convicted of.

17         And I think we were confused as to the fact that these

18   weapons charges, but no convictions, affected the underlying

19   calculations of the Guidelines.  And it really does not.

20         THE COURT:  It does not.

21         MS. ANDERSON:  And, so, based on that, Judge, I am

22   striking that myself.

23         THE COURT:  And those are not even convictions.

24         MS. ANDERSON:  No, they are not.  They are nolle

25   pros'd, stricken on leave to reinstate.

1          THE COURT:  Right.

2          MS. ANDERSON:  It was just a list of his criminal

3    history, to further enumerate to the Court his activity with

4    the law.  And I missed that.

5          THE COURT:  And there is not -- even in the cryptic

6    statements of the charge and so on, there is not -- even a gun

7    reference.

8          MS. ANDERSON:  So, I am moving to strike that myself.

9          THE COURT:  All right.  We will let you strike that

10   from your submission.

11         And, then, the last thing is the one we just talked

12   about.  Okay?

13         So, have I covered your objections?

14         MS. ANDERSON:  Yes, Judge, you have covered them

15   thoroughly.

16         THE COURT:  All right.

17         MS. ANDERSON:  Are you satisfied, Prince?

18         THE DEFENDANT:  Yeah.

19         MS. ANDERSON:  The record should reflect that my

20   client is satisfied that the Court has heard the objections and

21   the objections have been ruled upon.

22         THE COURT:  All right.

23         Mr. Fullerton, I will hear from you.

24         MR. FULLERTON:  Your Honor, I filed -- or I handed to

25   Ms. Anderson and I have given to your clerk -- a motion for --

1   the government's motion to withdraw our previously filed 851

2   notice as to Mr. Turner.  I do that pursuant to the plea

3   agreement the government handed Prince Turner, Jr.; and, I am

4   also moving, your Honor, pursuant to the plea agreement and

5   Guideline 5K1.1, for a downward departure, consistent with the

6   plea agreement, to 75 percent of the low end of his Guideline

7   range, which I figure as 75 percent of 324 months.

8          And I calculate that as 243 months, if my math is

9   correct.

10          THE COURT:  Well, after we discuss the Guideline

11   calculations, where we are is an Offense Level of 38, a

12   Category 4, which we have discussed.

13          The Guideline range is 324 to 405; and, 75 percent of

14   that is, indeed, 243 months.

15          MR. FULLERTON:  That is right.

16          THE COURT:  So --

17          MR. FULLERTON:  So, I am, pursuant to the plea

18   agreement and the Guideline 5K1.1, I am moving the Court to

19   depart based on Mr. Prince Turner's substantial assistance to

20   the government in the prosecution of this case, to impose that

21   sentence, consistent with the plea agreement.

22          And I would just like to say a couple of things about

23   Mr. Prince Turner, Jr.  He did -- I guess several things are

24   notable about him.  One is that -- and most importantly -- he,

25   when he decided to come forward and cooperate with the

1   government, I never -- in my experience with him, never -- had

2   any question that he was being truthful and complete in his

3   information that he provided to us.

4           He was one person that I can definitely say that

5   about.  I always thought that he was forthcoming, in answering

6   our questions to the best of his ability.  And I think he

7   demonstrated that in this courtroom when he testified at trial.

8   His manner and his willingness to cooperate were very evident

9   throughout my dealings with him.

10          And I think that the information he provided and his

11  testimony at trial was helpful to the government in convicting

12  -- in prosecuting the case, which resulted in the convictions

13  of his three co-defendants:  Wanda, Rodney and Vicki.

14          The other thing that I think is notable about Mr.

15  Turner is, if you will remember, back in October -- about a

16  month or so, three weeks or so prior to the trial -- the

17  government, on its own motion dismiss Prince Turner, Jr.'s and

18  Kevin Turner's father from the indictment; and, when the

19  Marshal Service received the order dismissing the indictment as

20  to Prince Turner, they promptly released Mr. Prince Turner,

21  Jr., from the custody of the -- I think he was being housed in

22  DuPage County at that time.

23          I learned about that -- I think I learned about it

24  shortly after that, but it really dawned on me a couple weeks

25  later, in a conversation with Ms. Anderson, that, in fact, her

1    client, Prince Turner, Jr., was no longer in custody.

2            And, to his credit, he promptly turned himself in when

3    notified to do so.  He did not need to be arrested and no

4    warrant was executed on him.

5            So, I think that speaks well of him and I think it,

6    you know, shows further that he has acted consistently with his

7    plea agreement in cooperating with the government and providing

8    the substantial assistance.  I think that departure is fully

9    warranted.  So, I am asking your Honor to impose that sentence

10   of 243 months.

11           THE COURT:  I take it if the 851 notice was allowed to

12   stand and he was convicted of, at the least, Count 1, his

13   sentence would have to be a mandatory life imprisonment

14   sentence?

15           MR. FULLERTON:  I believe that is correct, Judge, yes.

16           THE COURT:  Ms. Anderson, I will hear from you.

17           MS. ANDERSON:  Well, Judge, I was going to highlight,

18   also, Mr. Turner's cooperation with the government.  I was

19   there for those four or five days and he was very candid.

20           Moreover, I was really impressed with the fact that

21   once he was released, it took a lot to return himself back in.

22   And once I advised him he had to do that, he promptly went to

23   the U.S. marshals.

24           Judge, really at a sentencing hearing there is very

25   little a defense attorney can say with the Guidelines and with

1   the plea agreement.  So, I would just ask the Court to follow

2   the agreement set forth by the parties in the plea agreement

3   relative to the sentence; and, there is really not very much I

4   can say because Congress has already spoken for us.  And there

5   is very little a defense attorney can say.  And it is a very

6   frustrating position to be in because you really cannot argue

7   for your client like you want to because it is already carved

8   in stone with the sentence is going to be.

9        But I would ask the Court to consider that he did

10  surrender himself, as Mr. Fullerton has indicated, and that he

11  did fully cooperate with the government and testify truthfully.

12       THE COURT:  Mr. Turner, is there anything you would

13  like to say before I tell you whether I am going accept your

14  plea agreement with the government and impose the agreed-upon

15  sentence?

16       THE DEFENDANT:  Yeah.

17       I would like to state, just for the Court, I, in this

18  conspiracy, was not really a main person -- a main focal person

19  -- in it.  I was, like, a minor participant.  I really just

20  bought drugs from my brother.  And it was a minimum amount,

21  which was an eighth of a key.

22       But Mr. Fullerton here and the government said that I

23  am guilty of 150 keys, and I feel that that statement is

24  incorrect, based on me -- what I purchased from my brother,

25  particularly.  And that adds to, like, a kilo-and-a-half.

1          MS. ANDERSON:   Judge, may I just say something

2    briefly?

3          I showed Mr. Turner -- and, of course, I am his

4    attorney, but I am also bound by the PSR and the Guidelines.   I

5    showed him that the amount of cocaine attributable to him, as a

6    co-defendant, and indicated to him that although he purchased

7    drugs from his brother as an independent agent, that would be a

8    buyer/seller relationship that was not relevant to the

9    conspiracy before the Court.

10          I further explained to Mr. Turner what "conspiracy"

11    meant; and, I indicated by him giving a plea agreement to the

12    government that on two -- twice monthly, he would occasionally

13    take money he knew from drug proceedings was, indeed, acting in

14    furtherance of the conspiracy.

15          And I know he was confused, but I did try to show him

16    why there were 115 kilograms that were attributable to him, as

17    well as why the gun McLee had was attributable under 924(c)

18    because he had knowledge of it and it was foreseeable.

19          And this was all a part of the conspiracy; and,

20    therefore, because he was a participant and was involved in,

21    according to his plea agreement and according to the evidence

22    at trial, that that would put him, indeed, within an 846

23    conspiracy.

24          He may be confused as to why the amount of 150 is

25    attributable to him, but I did try to explain it as best I

```
 1    could.
 2            THE COURT:  Yes.
 3            I am going to try it myself in a second because it is
 4    a little -- it is not a tricky concept, but you need to be a
 5    little bit of a lawyer to understand.  But I am going to
 6    explain it to you.
 7            But I understand what you are telling me perfectly
 8    well.
 9            Did you want to tell me anything else, Mr. Turner?
10            THE DEFENDANT:  Well, I will wait until you --
11            THE COURT:  Here is how it works.  I know what you
12    personally did by way of drugs -- buying and selling or
13    involvement, moving money or whatever you did -- in this group
14    of people.
15            There was a group of people and they had a common
16    purpose.  And they had, if you will, not an expressed agreement
17    to be engaged in this drug business, but they had what is
18    called a de facto agreement.  Everybody was operating.  Kevin
19    was at the top of the pyramid, but everyone else was, in one
20    way or another, taking their marching orders from him or they
21    were in a joint enterprise.  Okay?
22            It is like a partnership.  A conspiracy is the same as
23    a partnership.
24            If you had a business and you are selling hamburgers
25    and you had two partners and you -- there were three of you
```

 1   selling hamburgers -- you are all responsible.

 2        If you have a partner and he goes out and spends money

 3   in the name of the partnership, you have a liability for

 4   whatever money or bills your partner runs up.  Because under

 5   the law of partnership, any partner can bind or cause the other

 6   partner to pay money.

 7        That same idea finds its way into the Guidelines.

 8   Because it is a conspiracy and you are all responsible for each

 9   other's conduct -- even if you personally do not engage in

10   it -- the law says whatever is reasonably foreseeable to you by

11   way of quantity of drugs, whether you handle them or not, is

12   chargeable to you.  And it is calculated in your sentence.

13        Even if you never touched 100 -- let us say you

14   touched two kilos of drugs, but the conspiracy that you are

15   fully aware of and you are helping to further the business of

16   the conspiracy is dealing in 300 kilos of cocaine.

17        If you are found guilty of that conspiracy, the law

18   saddles you with the 300 kilos.  And that is just what happened

19   in this case.

20        No one is saying that you personally handled 150 kilos

21   or more.  But no one can say this conspiracy involved less than

22   150 kilos of powder cocaine and a certain amount of crack

23   cocaine.  It did that.  And you were aware of, at least, the

24   fact that this conspiracy was a whole lot bigger than what your

25   personal contribution to it was.

 1          And, so, it is, if you will, the law of civil

 2     partnership, which comes into the law of criminal partnership.

 3     And you are responsible as if you did it yourself for

 4     everything you could foresee your brother Kevin and other

 5     people were going to do.

 6          So, that is how the law treats the quantity.  And you

 7     are stuck with that because the government can prove -- could

 8     prove -- ten times over that you knew that this conspiracy was

 9     a whole lot bigger than your personal involvement in the

10     quantity of drugs that you personally were handling.

11          So, that is the best way I can explain it.  And

12     neither Ms. Anderson nor I, nor Mr. Fullerton, we are both

13     powerless to change that law or that conclusion because that

14     comes from a courts higher than mine.  And I have to follow

15     that law.

16          And the evidence is overwhelming, from all sources,

17     that this conspiracy just went through a whole lot of dope.

18     That is the answer.

19          THE DEFENDANT:  So, are you saying just by me knowing

20     that a conspiracy was taking place -- I'm not getting paid from

21     it, I'm not getting --

22          THE COURT:  Not just by you knowing it, but you were

23     participating in it to the degree you did.

24          THE DEFENDANT:  That was counting money.  That is,

25     basically, what I did.  And that's it.

1    THE COURT:  Yes, yes.

2    You could maybe -- let's say you were really the low

3 man on the totem pole and you got -- let us say you were like a

4 driver.  You did not handle dope or money.  Let us say you were

5 just a driver for Kevin.  Just say that.  You never touched

6 dope.  Never touched money.  Never bought dope.  Never sold

7 dope.  But you were driving Kevin around and you knew Kevin --

8 or somebody else -- it did not have to be Kevin; Kevin is your

9 brother -- was going to a deal and he had -- he brought with

10 him, maybe they stuck it in the truck, 10 kilos of cocaine.

11    Just by you driving that -- knowingly driving the car

12 with drugs in it, and that Kevin is going to deal the drugs --

13 you are chargeable with that.

14    Why?  Because you assisted in bringing about that

15 deal.  Do you see that?

16    By you doing what you do, you were -- you did not play

17 a whole role into all of these drugs, but you knew these drugs

18 were being dealt.  You had a certain role within the

19 conspiracy.  And it was a little bit more than you made it to

20 be.  You said you were a minor participant.  That is probably

21 very debatable.  But I am not saying you were nearly as big as

22 Kevin or maybe -- or Vicki was bigger in this conspiracy than

23 you.  There is no question about that.  Rodney was bigger than

24 you in this conspiracy.  They did more.  They had more

25 involvement in the dope.  But you were a player in the game.

1  Okay?  And, so, the law says, "Well, let's see what did Prince.

2  Jr., know about what the conspiracy was about."

3        And, so, the law makes us all look at that critically.

4  And that is how we got to plus-150 kilos.

5        So, the law visits that on you.  No one is saying you

6  personally handled every bit of all of those drugs.  But you do

7  not have to.

8        And let us make no bones about it.  It is tough law.

9  Ms. Anderson is very right about what she said.  She feels

10 frustrated because she cannot argue for a better sentence for

11 you.  And she said there is -- nobody can change the

12 Guidelines, another than Congress and the Sentencing

13 Commission.  We are all stuck at this.  Okay?

14       It does not make my happy to have to look at a

15 reasonably middle-aged person, anyway, and say, "This is your

16 deal and I am going to agree to it because I think it is fair

17 deal."

18       I am not pretending this is an easy punishment, either

19 for you to do or for me to impose.  But the alternative, I

20 suppose, was -- and it was a judgment call you made way back --

21 was if you go down on this charge, if you do not have a plea

22 agreement, then you kiss your future goodbye because you are

23 going to go to jail for the rest of your live -- or at least

24 that was a distinct possibility.

25       So, am I going to sit here and tell you that you made

1    a wise deal or unwise deal?  I do not know.  That is your call.

2    But my question is whether, in terms of the punishment you are

3    going to get and the benefit you are going to get, in all

4    things considered -- not only for you, but for this whole

5    criminal justice system -- is it a fair deal?  It probably is.

6           Is it an easy deal?  Uh-huh.  I do not pretend that it

7    is.  But I am going to accept it because you cut the deal.  You

8    knew what you were doing.  Your lawyer assisted you.

9           And it could have been worse, although it is hard to

10   imagine, you know, when you actually sit and face the sentence

11   you have agreed to receive.  You know, it is a tall sentence.

12          On the other hand, if things were different, you have

13   to compare it to what might have been.  And that is a tough

14   comparison because, you know, everybody thinks, "Well, maybe I

15   would not have been convicted," or something like that.  That

16   is -- you cannot look at it that way.  The evidence was strong

17   against you.

18          But I do think, for whatever it is worth, I listened

19   to you testify.  I thought you were actually a very truthful

20   and you were a good witness for the government.  I do not have

21   any doubt that you kept your end of the bargain.  And that is

22   another reason that I am going to sign on to the deal.

23          If I thought you lied your behind off, I would not

24   have signed on to this deal.  But I thought you were a good

25   witness and I thought you were truthful.

```
1              I do not think you overstated it.  I do not think you
2    put people into it that you did not know about.
3              But, on the other hand, when you knew about something,
4    I think, you talked about it honestly, and that is the only way
5    I can measure it.
6              I do not know everything you or Ms. Anderson or the
7    prosecution knew about what went on here, but I know enough to
8    know that I thought you were truthful.
9              So, that is where we come out, Mr. Turner.
10             I do not know if these explanations make it any easier
11   for you; but, at least I think it makes it more comprehensible
12   for you to understand how the law works, what kind of an
13   arrangement you had with the government and why present day I
14   am accepting it.  Okay?
15             So, consistent with -- did you want to say anything
16   more?
17             THE DEFENDANT:  Yes.
18             I just want to say one thing.  Like, normally, if --
19   and this is, I know -- I understand that this is Mr. Fullerton
20   and the government and my agreement -- plea agreement; but,
21   normally when someone pleads, they get, like, three points off
22   and, like, 30 percent off their sentence, or something like
23   that.  And I am really questioning why I didn't get my
24   three points.
25             THE COURT:  You got two points.
```

1        THE DEFENDANT:  And I got two points.

2        THE COURT:  You did not get the one point because I

3   think it came late in the game.

4        MS. ANDERSON:  I sent him -- I wrote my client -- a

5   letter explaining -- it is in the plea agreement -- that

6   because he waited until the last minute to plead guilty and the

7   government had to prepare for trial, that that is why he did

8   not get the full three points of Acceptance.

9        THE COURT:  Okay.

10       You got two of the three points.

11       MS. ANDERSON:  Right.

12       THE DEFENDANT:  Right.

13       THE COURT:  You did not get the third one because it

14  came, essentially, too late.  They prepared to go to trial on

15  you; and, so, the law says that extra point should only be

16  given when it spares all of the parties and the government and

17  everybody from preparing.  And it is a timing thing.

18       So, you did get two out of the three points.  You did

19  not get all three, that is true, and that is the reason.

20       And the other thing is on a percentage off, you wound

21  up with a deal that you got basically 25 percent off what you

22  would have gotten had you been -- and the low end.

23       Actually, you might have gotten more than -- there is

24  a Guideline range.  Okay?  Your deal is 75 percent of the low

25  end of the Guideline range.  Okay?

1          The low end of the Guideline range is 324 months, but

2    the top end of the Guideline range is 405 months.  So, if you

3    were convicted and you did not have this deal, you were surely

4    facing life in prison.  And if you were not facing life in

5    prison, under the Guidelines you were probably -- at least

6    possibly -- looking at 405 months.

7          Now, the difference between 324 -- I know this is a

8    lot of math, but stay with me.

9          The difference between 324 months and 405 months,

10    there is an about seven years -- give or take a few months --

11    difference between the low end of the Guideline range and the

12    upper end of the Guideline range.

13          So, this deal that you have gives you 75 percent of

14    the low end of the Guideline range.  So, the starting point for

15    the calculation is the low end of the Guideline range.  And

16    75 percent off of that.  So, that is really what I am going

17    give you.

18          But at the least, if you did not have this deal, you

19    not only would not have gotten 75 percent off, but it would

20    have been necessarily off the low end -- you wo not have gotten

21    anything off the low end -- of the Guideline range.  And you

22    might have been sentenced at the upper end of the Guideline

23    range.  It was 405 months, which is somewhere in the

24    neighborhood of 37 years or something -- 38 years or some

25    number too large for us.

1           MS. ANDERSON:  Close to 40, Judge.

2           THE COURT:  Yes, it is close to 40.  Not quite 40.

3           So, I know it is a lot of math I am throwing at you,

4  but the point is that you got not only 75 percent or 25 percent

5  off, but in a real sense you got more than 25 percent off

6  because you were looking at a much higher range.

7           Do you see that?

8           I know you cannot feel that because we are talking

9  about a lot of numbers to start with --

10          THE DEFENDANT:  Yeah.

11          THE COURT:  -- right?

12          THE DEFENDANT:  Yes, yes.

13          THE COURT:  I know that.

14          I do not know how to explain it to you any better, but

15  that is how it comes out.

16          So, you did get two out of the three points.  And you

17  got, at the least, 25 percent off, and probably in real terms

18  more than that.

19          Is there anything else you want to ask me or tell me?

20          THE DEFENDANT:  That's about it.

21          THE COURT:  All right.

22          Well, as I said to you, I am going to accept your

23  agreement; and, consistent with that agreement -- and I cannot

24  change the agreement on my own.  I either accept this agreement

25  as it is or reject it and you start over with the government.

1    Okay?  And I am not going to do that.

2            I am going to impose a period of incarceration in

3    custody in the Bureau of Prisons in the amount of 243 months.

4            There will be a period of supervised release of

5    five years.

6            A special assessment of a hundred dollars.

7            I will not impose any additional costs or expenses or

8    fines because I think even though he may earn some money in

9    prison, I think realistically it is not called for.

10           Did I miss anything, Mr. Freeze?

11           MR. FREEZE:  Judge, perhaps a waiver of costs of

12   incarceration?

13           THE COURT:  I will waive those costs of incarceration.

14           There was not any forfeiture here, was there?

15           MR. FULLERTON:  Not as to this defendant, your Honor.

16           THE COURT:  All right.

17           MR. FREEZE:  I think maybe just one special condition

18   of supervised release and that is providing financial --

19   accurate financial information.

20           THE COURT:  I will require that.

21           Mr. Turner, have you thought about where you want me

22   to recommend that you serve your time?

23           MS. ANDERSON:  Judge, I was going to ask if it would

24   be possible that he could serve in Pekin, because I believe

25   Kevin has been -- made the same request -- that both brothers

1   be in the same facility, so that the family will be able to

2   visit them both and it will be not such an inconvenience for

3   them.

4          THE COURT:  I will recommend Pekin, but I cannot

5   guarantee it.  And that is a Bureau of Prisons' decision.

6          MS. ANDERSON:  I explained that to him.

7          THE COURT:  But I will recommend Pekin.

8          Mr. Turner, I think you waived your right to appeal.

9   I would normally advise you of that.

10         But there is an appeal waiver; is there not?

11         MR. FULLERTON:  Yes.

12         THE COURT:  All right, Mr. Turner.  It has been a

13  tough road, but it was you who traveled it and I do not have

14  much ability to change it.  Okay?

15         THE DEFENDANT:  Okay.

16         MR. FULLERTON:  Judge, pursuant to the plea agreement,

17  we move to dismiss the remaining counts as to this defendant.

18         THE COURT:  All right.

19         Any other counts will be dismissed.

20         MS. ANDERSON:  And I would acknowledge receiving the

21  government's motion to dismiss the 851 Information.

22         THE COURT:  Okay.  Very good.

23         THE DEFENDANT:  May I have a moment with my family,

24  please?

25         THE COURT:  Yes.

1          Well, the marshals are in charge of that.

2          Can they visit him upstairs?

3          THE MARSHAL:  No.

4          THE DEFENDANT:  I just want to talk to my --

5          THE MARSHAL:  No.

6          THE COURT:  Let him just say hello real fast.  Okay?

7          MR. FULLERTON:  Thank you.

8          (Brief pause.)

9          MS. ANDERSON:  Judge, I believe the brothers are

10   separated in the MCC.  The government has to do something about

11   that.  If I mentioned that a thousand --

12          MR. FULLERTON:  Judge, I have sent two letters to the

13   MCC on this issue requesting that any separation order that was

14   previously entered be lifted as to the two brothers.  I sent

15   one in December and I sent one, I believe, the day --

16          THE COURT:  Why do you not make a call over there and

17   see if, at least, they have considered it there.  Maybe they

18   have a good reason why they will not honor it.

19          MR. FULLERTON:  Right.

20          So, I will follow up, again, with a phone call.  I

21   don't have any control over there.

22          MS. ANDERSON:  I have also told him that.

23          Let me say that I spent a lot of time with Mr. Turner

24   on Monday.  I explained to him any request for an issue -- that

25   you can make a recommendation, but it was strictly the Bureau

1  of Prisons' business.

2         I also explained to him any custody issues with the

3  MCC was still in the auspices of the Bureau of Prisons and the

4  U.S. Marshal, and that you can make recommendations.  That is

5  all you could do.

6         Now, I was told this morning -- I walked in and I

7  forgot -- I had other things on my mind in reference to his

8  case -- that there was the request by Ms. Carothers to have

9  them put together.  And he had mentioned it to Mr. Turner.  I

10 forgot.

11        I am asking that if it is possible, that it be done.

12 But I have also given him a caveat that this Court can make a

13 recommendation and that is it.  And I also prefaced that by the

14 fact that when he was in DuPage County and I could not travel

15 there, that this Court made several requests to get him here.

16 But he came when the U.S. Marshal brought him.

17        THE COURT:  I do not have any control over that,

18 although I will recommend Pekin, even though I did that for

19 Kevin, as well.  So, the Bureau of Prisons will do whatever it

20 will do.

21        Mr. Fullerton is going to call and at least see, on

22 the request for present separation or not, whether they will

23 lift the separation order or desire.

24        MS. ANDERSON:  To go further, I would also call one of

25 the attorneys and see what the status is of the separation

1    order.

2             THE COURT:  All right.

3             MR. FULLERTON:  Thank you, your Honor.

4             MR. FREEZE:  Thank you.

5             MS. ANDERSON:  Thank you, Judge.

6                      *   *   *   *   *

7    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
8

9
     /s/ Joene Hanhardt                    May 28, 2009
10

11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25